[Civ. No. 5549. Third Appellate District.—January 14, 1936.]

In the Matter of the Estate of HARRIS GINSBERG, Deceased. IDA BLUM, as Executrix, etc., Appellant, v. IDA BLUM et al., Respondents.

Martin Gang and Bradford, Cross & Prior, for Appellant.

Claude M. Adams and Fontaine Johnson for Respondents.

PULLEN, P. J.—This appeal is from an order settling the final account of Ida Blum as executrix of the last will and testament of Harris Ginsberg, deceased.

The order, of which the executrix, appellant herein, complains, directs her to amend her account as filed and include therein the principal and accrued interest received from an alleged joint tenancy account opened by deceased in his lifetime in which he and appellant were beneficiaries.

Appellant contends the evidence was insufficient to justify the finding that the deceased was of unsound mind at the time he signed the purported joint tenancy cards which the order of the court annulled, and furthermore that an agreement creating a joint tenancy in a bank account is not subject to attack after the death of one of the parties on any ground other than fraud or undue influence. The real issue is

whether or not the deceased possessed sufficient mental capacity to understand the nature of a joint tenancy agreement and its effect upon his estate.

The testimony in the case paints a picture of Harris Ginsberg, the decedent and the author of the attempted joint tenancy, as a man approximately 78 years of age, a native of Poland, who had lived in Sacramento for many years and who, by thrift and industry, almost to the degree of miserliness, had accumulated considerable estate, sick, hard of hearing, illiterate, suspicious, taciturn, distrustful of everyone with whom he came in contact, with the exception perhaps of his sister Ida Blum and a predeceased brother Max.

The court found that at the time of his death and for several years prior thereto the mental condition of decedent had become so impaired that in the latter months he was unable to look after his business affairs; that he resided with his sister, appellant Ida Blum, and a brother Max, and during the greater portion of that time decedent was in such a mental and physical state that it was necessary for Max to care for decedent in his business and physical requirements.

The court also found that on the 12th day of March, 1934, and after the death of Max, Harris Ginsberg was removed to the Eastmont Sanitarium, where he remained until his death on April 12, 1934. It was at this sanitarium on the 12th day of March, 1934, in the presence of an attorney, the sister, Mrs. Blum, Mrs. Pellegrini, the manager of the sanitarium, a nurse, and a representative from the bank that the joint tenancy signature cards were executed. It also appears in evidence that at the same time and place there was executed a purported last will and testament which gave all of the estate of decedent, share and share alike, to Ida Blum and Sam Ginsberg, the sole surviving sister and brother of the testator.

It also appears from the findings that Harris Ginsberg had been failing physically and mentally for a considerable period of time prior to his death and that he did not know or comprehend how much money had been paid him as liquidating dividends from the California National Bank, in which institution he had his funds, or how much he had to dispose of by his will. The court also found that he did not know he was signing a deposit card wherein appellant was becoming a joint owner with him in said account, nor did he know the

nature of such account nor the effect of the joint tenancy agreement.

The court further found that no one, either before or after he signed said joint deposit card, explained to him what amount of money he possessed, and even if the nature of said transaction had been explained to him it would have availed him nothing for he was incompetent to understand such a situation, and at the time of the creation of said alleged joint tenancy account decedent was both mentally and physically incompetent to such an extent that he had no knowledge or understanding that he was creating a joint tenancy account and that he was incompetent to deal in such matters and unable at that time to understand the nature of such transactions and did not comprehend their effect upon his estate.

Such is a brief summarization of the findings of the court. ▆ Inasmuch as appellant contends that the evidence is insufficient to support such findings, it is the duty of the court to examine the record to ascertain what, if any, substantial evidence may be found in support thereof, considering not only the evidence adduced but the inferences which may be logically deduced therefrom. With that in mind we have examined the testimony of various persons with whom the decedent came in contact, the custodian of the safety deposit vaults, where for many years deceased kept his deposit box, officers of the bank wherein he had his bank account, an employee of a cigar store belonging to deceased, the trust officer of the bank, Mr. Miller, a long and close acquaintance of deceased, and others.

From the testimony of Mr. Cotter, the vice-president and cashier of the National Bank of D. O. Mills, and later vice-president of the California National Bank, we find he had known Harris Ginsberg for twenty or twenty-five years, during which time he had seen him perhaps once or twice a month; that in his opinion he was not mentally competent for the last few years prior to his death. This opinion was based upon observation of the decedent and conversations the witness had with him during the period of time mentioned. In 1921 Harris was given a cigar store by his brother Sam. The business was being operated at a loss and upon advice from the witness it was finally disposed of in 1928 and the proceeds turned over to the trust department of the bank, from which he withdrew sufficient money each month to main-

tain himself. From the way Harris attempted to operate this store and carry on his business affairs the witness also formed an opinion that he was incompetent. The witness also testified that after the California National Bank closed he endeavored to explain to Harris Ginsberg the situation in regard to the bank, but was unable to make him understand. The witness also testified he was positive the decedent was mentally incompetent to understand what a joint tenancy account might be, which opinion was also based upon his observation and conversations with Harris Ginsberg over a period of years.

Mr. Didion, a teller in the bank wherein the decedent had his account, knew Harris Ginsberg for about thirty years and had seen him frequently, at one time over quite a period, almost daily, and later probably at least once every month and sometimes every two weeks or ten days. When asked his opinion as to the mental competency of the decedent the witness said that after the bank closed he did not seem to be mentally competent, which opinion was based upon talking to the decedent and observing his general appearance. After the bank closed Harris would come to the bank about every two weeks and ask for his money and seemed unable to comprehend why he could not be paid. This conduct was repeated by Ginsberg again and again for a considerable period of time.

Mr. Smith, keeper of the vaults of the California National Bank, testified he knew the decedent for six or seven years, and that he did not think he was competent to transact business in 1933 and 1934, which opinion was based upon various eccentricities and acts of the decedent in regard to the handling of his safety deposit box and his general acts and conduct in connection therewith. He testified Ginsberg would come to the vaults and wander around listlessly, hand the custodian his key without saying anything, and it would be necessary on almost every occasion to take him to the desk to sign an admittance card; that he was very absent-minded and would forget to replace the property in the box or he would leave the box open on the desk and he would have to be brought back in order that the box might be properly replaced and locked. The witness also noted a gradual decline in the physical and mental condition of the decedent and in the

latter months he was less alert and more apt to wander aimlessly around the corridors of the bank.

Mr. T. V. Dunn, an officer in the same bank, testified that he knew Harris Ginsberg for about twenty-five or thirty years. That in his earlier years he was competent to transact business, but he observed a deterioration in the later years, and often if addressed he would not answer and would look at the questioner in a blank manner; that it was necessary for the witness to draw the monthly check in favor of Harris Ginsberg and to go with him to the teller to obtain the money therefor. Also he did not seem to understand the procedure and he depended entirely upon the trust department to handle the funds for him, and in his opinion, the decedent would not understand the nature of a joint tenancy account.

Mr. Adams, a trust officer of the bank, knew Harris Ginsberg for about ten years prior to his death, and would see him on some occasions as often as once each week, and later, once a month when he would call at the trust department to draw his monthly allowance. This witness was of the opinion that the decedent was not competent in his later years and based this statement upon his conversations, his general attitude and his apparent lack of understanding of things that were told him. The witness attempted on many occasions to explain to Harris Ginsberg why he could not draw his money and how the affairs of the bank would be handled during its liquidation, but none of these things was the decedent apparently able to understand. He had at one time, in his younger days been employed by the Southern Pacific Company, and was under the impression that the company still owed him considerable money, and at the request of the decedent the witness wrote to the company in regard to this matter, the company replying that it did not owe him any money and did not know upon what he was basing his claim, but Harris Ginsberg insisted on many occasions that he write again as he wanted his money from the company. Apparently this claim was groundless and but a figment of the imagination.

Other witnesses testified along similar lines to the foregoing.

It is also in evidence that he was dependent largely upon a predeceased brother, Max Ginsberg, during his lifetime, for assistance, and that he depended also upon his sister with whom he lived with his brother Max, prior to the death of Max.

Mrs. Pellegrini, the owner and manager of the sanitarium where Harris was taken, testified that she was present when the joint tenancy account card was signed, but she heard no one explain to Harris what the meaning or effect of a joint account was.

Nothing would be gained by dealing with greater particularity in the various shortcomings and eccentricities of the decedent, but an examination of the record reveals sufficient to justify the finding of the court that the decedent was not possessed of sufficient mental capacity to understand the nature of a joint tenancy agreement or its effect upon his estate.

Some point is made of the fact that at the time of the execution of the joint tenancy agreement a will was executed at the same time and place, and that no attack was made upon this document. A very satisfactory explanation is made, however, that this will distributed the property in the manner provided by law and nothing would have been gained by an attack upon the will as the result would have been the same whether the property was distributed under its provisions or by operation of the law of descent and distribution.

It is next urged by appellant that inasmuch as there was no evidence or finding on the issue of fraud or undue influence that the rule as to the evidentiary effect of a joint tenancy agreement as set out in section 15a of the Bank Act, Statutes of 1921, page 1367, would apply. Such act provides that "the making of the deposit in such form shall, in the absence of fraud or undue influence, be conclusive evidence in any action or proceeding in which either such bank or the surviving depositor is a party of the intention of both depositors to vest title to such deposits and the additions thereto in such survivor".

It is essential that in any contract whether to create a joint tenancy account or otherwise, there must exist parties competent to enter into the contract and there must be a mutual understanding of what is being done. The Bank Act did not intend to create a contract if in fact none existed.

Respondent cited and relied upon the case of *O'Brien* v. *United Bank & Trust Co.*, 100 Cal. App. 325 [279 Pac. 1048], wherein the court said:

"She cites and relies on section 15a of the Bank Act (Stats. 1921, page 1367). There is nothing in the statute showing

that the legislature was addressing itself to agreements attempted to be executed by insane or incompetent persons. Repeals by implication are not favored and, nothing to the contrary appearing, sections 38, 39, and 40 of the Civil Code will be construed together with section 15a of the Bank Act, and force and effect will be given to the provisions of each.''

We are therefore of the opinion, by the reading of the testimony and on examination of the authorities cited, that the decedent was of unsound mind at the time he signed the so-called joint tenancy cards, and that the section of the Bank Act referred to has no application where the creator of the joint tenancy account was mentally incompetent to enter into such an agreement.

The judgment is affirmed.

Thompson, J., and Plummer, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 12, 1936.